**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| ANTONIO M. MATOS,<br><br>    Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI,<br>Acting Commissioner of Social Security,<br><br>    Defendant. | Civil Action No. 21-02024 (FLW)<br><br>**OPINION** |

**WOLFSON, Chief Judge:**

Antonio Matos ("Plaintiff") appeals from the final decision of the Acting Commissioner of Social Security, Kilolo Kijakazi ("Defendant"), denying Plaintiff's application for disability under Title II of the Social Security Act (the "Act"). After reviewing the Administrative Record ("A.R."), the Court finds that the Administrative Law Judge's ("ALJ") decision was based on substantial evidence, and accordingly, the ALJ's decision is **AFFIRMED**.

I. **FACTUAL AND PROCEDURAL HISTORY**

Plaintiff, born on June 13, 1963, was 55 years old when he was laid off from his job as a supervisor at a neon products manufacturing facility on July 18, 2018, which is also his alleged onset disability date. (A.R. 29, 48, 72, 193.) On April 14, 2019, Plaintiff, represented by counsel, filed a Title II application for a period of disability and disability insurance benefits, alleging disability due to thoracic spurring, thoracic hemangiomas, lumbar spondylosis, thoracic level 6-7 disc herniation, and high lead values in blood. (A.R. 29, 73.) The application was denied initially on July 27, 2019, and upon reconsideration on August 30, 2019. (A.R. 29.) Plaintiff then filed a

1

written request for a hearing before an ALJ, which was held via telephone on May 15, 2020.  (*Id*.)  On July 1, 2020, the ALJ determined that Plaintiff was not disabled.  (A.R. 36.)

On August 12, 2020, Plaintiff retained new counsel.  (A.R. 14.)  On August 23, 2020, Plaintiff's counsel assisted Plaintiff in obtaining a functional report from one of Plaintiff's treating physicians, Dr. Richard Paris, M.D.  (A.R. 20-25.)  Five days later, Plaintiff filed an appeal of the ALJ's decision to the Appeals Council, which included the newly obtained functional report.  (A.R. 169-71.)  On December 9, 2020, the Appeals Council found no basis to change the ALJ's opinion, and therefore, denied review of the decision.  (A.R. 1.)  In so doing, the Appeals Council determined that the new functional report "d[id] not show a reasonable probability that it would change the outcome of the decision."  (A.R. 2.)

## A. Review of Medical Evidence

### i. Medical Records

In January 2019, Plaintiff was treated at Summit Medical Group by Dr. Paris, his primary care physician, and complained of joint pain that worsened after activity.  (A.R. 315-16.)  On physical examination, Plaintiff showed no muscle aches, back pain, or swelling in his extremities.  (A.R. 317.)  Plaintiff also had normal tone and motor strength, and no contractures, malalignment, tenderness, or bony abnormalities.  (*Id*.)  Dr. Paris assessed that Plaintiff had multiple joint pains, and recommended a rheumatology evaluation.  (*Id*.)  Plaintiff underwent that rheumatology evaluation with Dr. Swosty Tuladhar, M.D., on February 8, 2019.  (A.R. 311-15.)  Plaintiff reported chronic joint pain in his wrists, elbows, shoulders, knees, and ankles for the prior 3 to 4 years, but the symptoms had worsened in the last 6 months despite no triggering event.  (A.R. 313.)  Dr. Tuladhar assessed that Plaintiff had bilateral knee pain, and opined that the symptoms were most likely due to degenerative joint disease.  (A.R. 314.)  Dr. Tuladhar also assessed that

Plaintiff had bilateral hand pain and paresthesia of the upper limb, and ordered x-rays. (*Id.*) The knee x-rays showed mild osteoarthritis, but no evidence of chondrocalcinosis, erosive arthropathy, joint effusion. (A.R. 329.) The hand x-rays found no evidence of corrosive or significant degenerative arthropathy. (*Id.*) Dr. Tuladhar prescribed Tylenol, physical therapy, and a wrist brace. (*Id.*)

Plaintiff visited Dr. Paris, again, on March 4, 2019, complaining of exacerbated joint pain, as well as thoracic back pain and neck pain. (A.R. 310.) Plaintiff reported that the pain made it difficult to fall asleep at night or stay asleep, and anti-inflammatories were not alleviating symptoms. (A.R. 310-11.) On examination, Plaintiff had normal motor tone and muscle strength, no joint malalignment or tenderness, and normal movement in all extremities. (A.R. 311.) At Plaintiff's follow up visit with Dr. Tuladhar on March 8, 2019, Plaintiff noted no new symptoms since his prior visit. (A.R. 307.) Dr. Tuladhar also noted that Plaintiff had medial joint line tenderness in his knees, but normal motor strength, good range of motion in his extremities, normal flexion and extension in his lumbar, and normal gait. (A.R. 308.) On March 22, 2019, Plaintiff returned to Dr. Paris for a follow-up appointment regarding his back pain. (A.R. 300-02.) Plaintiff reported that he primarily had thoracic pain and continued to have some lumbar pain that was flaring and making it difficult to function normally, but his bilateral wrist and hand paresthesias were improved with a brace. (A.R. 301.) Plaintiff also reported that he was attending physical therapy for his joint and back issues, but they remained refractory. (*Id.*) Plaintiff stated he had some transient improvement after a course of oral prednisone and meloxicam. (*Id.*)

On May 13, 2019, Plaintiff visited Dr. Olabisi Asimolowo, M.D., for a pain management evaluation, complaining of bilateral mid back pain that was a 4/10 on good days and a 10/10 on bad days. (A.R. 294.) Dr. Asimolowo noted that Plaintiff had normal spine flexion and extension,

normal tone in his upper and lower extremities, and 5/5 strength in his elbows and wrists, as well as 5/5 grip strength in both hands.  (A.R. 296.)  Dr. Asimolowo assessed Plaintiff as having thoracic radiculopathy, cervical radiculopathy, and thoracic spondylosis.  (A.R. 297.)  Dr. Asimolow prescribed Gabapentin.  (*Id*.)  On May 17, 2019, Plaintiff underwent a cervical spine MRI, which found degenerative changes predominantly at C3-C6 and C6-C7, demonstrating moderate spinal canal and mild to moderate neural forminal stenosis.  (A.R. 326.)

On May 20, 2019, Dr. Komal Naik, D.O., upon a referral from Dr. Tuladhar, performed a neurological consultation and electrodiagnostic study.  (A.R. 321.)  Dr. Naik's impression was that the findings were abnormal due to bilateral demyelinating median neuropathies at the wrist.  (*Id*.)  Dr. Naik noted that these findings were compatible with a diagnosis of carpal tunnel syndrome with moderate severity.  (*Id*.)

Between June 7, 2019, and August 13, 2019, Plaintiff attended physical therapy for his neck, back, and knee pain.  (A.R. 272-79, 357-68, 373-82, 387-90, 398-404.)

At a June 27, 2019 visit with Dr. Asimolowo, Plaintiff noted that physical therapy was helping with his symptoms, but "not taking care of the problem."  (A.R. 395.)  Plaintiff stated his pain was a 5 to 6 out of 10, and his examination found bilateral rhomboid tenderness and tenderness of the T6 and T7 transverse process bilaterally, but 5/5 strength in all categories, and normal cervical flexion and extension, normal gait and station, intact sensation, no trigger point pain, and normal thoracolumbar appearance.  (A.R. 395-97.)  Dr. Asimolowo advised Plaintiff to continue taking Gabapentin, attending physical therapy, and scheduled a thoracic epidural steroid injection, which was administered on July 1, 2019.  (A.R. 379, 390-92.)

On July 8, 2019, Plaintiff met with Dr. Tuladhar, and Plaintiff complained that the epidural did not provide symptom relief and the pain seemed to be worse.  (A.R. 385.)  On examination,

Plaintiff had bilateral medial joint line tenderness in his knees and reduced thoracic spine range of motion, but normal range of motion in the cervical and lumbar regions, normal motor tone and strength, normal gait, and no neurological deficits.  (A.R. 386.)  Dr. Tuldhar assessed that Plaintiff had osteoarthritis of the knee, thoracic spondylosis without myelopathy, bilateral carpal tunnel syndrome, cervical spondylosis, and degenerative joint disease of the hand.  (*Id*.)

On July 29, 2019, Plaintiff had a follow-up visit with Dr. Asimolowo, and complained that the epidural did not provide symptom relief.  (A.R. 368.)  Plaintiff's examination found tenderness of the bilateral rhomboids, and tenderness of the T6 and T7 transverse process bilaterally.  (A.R. 372.)  Plaintiff also had normal spine flexion and extension, and full strength in her wrists and hand grip.  (*Id*.)  Dr. Asimolowo prescribed Gabapentin, Naproxen, and started Plaintiff on Medrol dose pack and cyclobenzaprine.  (A.R. 373.)

Plaintiff returned to Dr. Asimolowo on November 5, 2019, for a 6-week follow-up visit after receiving trigger point injections on September 24, 2019.  (A.R. 447.)  Plaintiff stated that these injections provided some relief.  (*Id*.)  Plaintiff also noted that he had stopped physical therapy due to the lack of relief.  (*Id*.)  Plaintiff returned again on December 9, 2019, to undergo further trigger point injections.  (A.R. 445.)

On May 7, 2020, Plaintiff attended a virtual visit with Dr. Asimolowo.  (A.R. 418-23.)  Plaintiff performed a self-examination, and reported tenderness of his bilateral rhomboids.  (A.R. 422.)  Dr. Asimolowo assessed that Plaintiff had thoracic spondylosis, thoracic radiculopathy, and muscle pain.  (A.R. 423.)

### ii.  Medical Opinion Evidence

On July 24, 2019, Arthur Pirone, M.D., a state agency medical consultant, reviewed the medical record at the initial level and found Plaintiff to be not disabled.  (A.R. 78.)  Dr. Pirone

determined that Plaintiff had the functional capability to occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk for 6 hours a day, sit for 6 hours a day, and push or pull an unlimited amount, except for the lifting and carrying limitations. (A.R. 76.) Dr. Pirone also opined that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (A.R. 77.) Dr. Pirone assessed that Plaintiff had the RFC to perform his past relevant work as generally performed in the national economy. (A.R. 77-78.) On August 29, 2019, Dr. Nancy Simpkins, M.D., considered the medical record on reconsideration and affirmed the opinions of Dr. Pirone. (A.R. 87.)

Following the ALJ's decision, but prior to filing an appeal with the Appeals Council, Plaintiff obtained a "Physician's Report for Claim of Disability Due to Physical Impairment," which was completed by Heather Robbie, APN, on behalf of Plaintiff's treating physician, Dr. Paris. (A.R. 25.) In the report, Nurse Robbie stated that Plaintiff had around fifteen years of back pain, and that the clinical findings related to this pain were that Plaintiff's lumbar had a loss of lordosis, all planes of flexion and extension, as well as side bending, were limited by pain and stiffness, there was tenderness and palpation noted in his lumbar sacral region, and Plaintiff had pain with bilateral facet loading. (A.R. 20.) Nurse Robbie noted that the objective testing showed moderate cervical stenosis at C5-C6, mild osteoarthritis bilaterally of the knees, and lumbar spondylosis at L5-S1. (*Id*.) Plaintiff was diagnosed with chronic pain syndrome, with a poor prognosis, and the pain was expected to last at least 12 months. (A.R. 21.)

As to his functional capacity, Nurse Robbie stated that, due to pain, Plaintiff must lie down during the day for 15 minutes on the hour. (*Id*.) The report also stated that Plaintiff can sit for 15 minutes or less at a time, and stand or walk for 15 minutes or less at a time. (A.R. 22.) Further, during an 8-hour work day, Nurse Robbie opined that Plaintiff could cumulatively sit for 1 hour

or less, stand for 1 hour or less, and must frequently be in a reclined position because of his pain. (*Id.*) Nurse Robbie also stated that Plaintiff could occasionally lift or carry 5 pounds, occasionally stoop, kneel, crouch, and reach, but never crawl or climb. (A.R. 23.) According to the report, Plaintiff could, with either hand, repeatedly perform simple grasping, pushing and pulling, and fine manipulations. (A.R. 24.) In addition, Plaintiff could perform pushing and pulling with both of his legs. (*Id.*) Finally, Nurse Robbie stated that Plaintiff could not take the bus or subway alone due to his inability to sit for prolonged periods of time. (A.R. 25.)

## B. Review of Testimonial Evidence

### i. Plaintiff's Testimony

At the hearing, Plaintiff testified that he completed high school and lives at home with his wife and one child. (A.R. 60, 62.) Plaintiff testified that between 1984 and 2018 he was a supervisor and working foreman at a neon products manufacturing facility. (A.R. 48.) In that role, he not only directed employees, but helped move items, loaded and unloaded machines, and moved pallets. (*Id.*) In that job, Plaintiff testified he sat about 40% of the day, and the rest of the day he was moving around and lifting objects that averaged 50 to 60 pounds. (A.R. 48-49.) In his supervisory role, he managed around 30 people throughout the work day. (A.R. 49.) Plaintiff explained that they closed down his department in 2018, and he was laid off. (A.R. 64.) After losing his job, he began looking for similar work. (A.R. 65.)

As to his pain, Plaintiff stated that he has pain throughout his whole body, but mostly in his thorax and his neck, where he believed he had herniations. (A.R. 51.) Plaintiff also noted he had hand pain, specifically, inflammation, numbness, and joint pain. (*Id.*) Plaintiff noted he had an upcoming hand surgery. (*Id.*) Plaintiff testified that when he breathes deeply, he experiences back pain because of his thorax, and it feels like he is "being punched through with a knife[.]"

7

(A.R. 51-52.)  Plaintiff also stated that he can sit comfortably for 15 minutes before needing to stand up and move around to relieve the pain.  (A.R. 52.)

Plaintiff explained that despite his pain, he is still able to drive three days a week for short distances, but he can only turn his neck 45 degrees while he drives.  (A.R. 52, 61.)  Plaintiff stated that if he drives for ten minutes or longer, his hands will go numb.  (A.R. 61.)  Plaintiff also noted that he has problems entering and exiting the car, and that he has to hold onto the car's grip handle and squat to enter and exit the car.  (A.R. 52-53.)  Plaintiff stated that he can drive about 15 minutes before he has to stop the car and lay the seat back or walk around to relieve his pain.  (A.R. 53.)  Plaintiff also maintained that walking up and down the stairs caused pain, and that he had to hold onto the railing and move one step at a time.  (*Id*.)

Plaintiff stated that at this time, he could only lift a maximum of 10 pounds due to inflammation in his hands and back.  (*Id*.)  Plaintiff also noted that he can walk around 100 to 200 feet before he has to stop due to pain in his spine.  (A.R. 54.)  Plaintiff explained that his spinal condition has affected his sleep, and that he sleeps very little because he spends much of the night trying different positions.  (A.R. 54-55.)  This back pain also causes him to spend 40% of every day lying down on the floor or a couch.  (A.R. 55.)  The pain also makes it difficult for Plaintiff to concentrate on watching movies or reading books.  (A.R. 55-56.)  Plaintiff cannot cook food and uses paper plates to avoid having to stand in front of the sink and do dishes.  (A.R. 57-58.)  Plaintiff testified that prior to his pain, he used to ride bikes, garden, and fish, but he can no longer do those activities.  (A.R. 58.)  Regarding the pain in his hands, Plaintiff said he has trouble gripping things, and cannot open a bottle of water.  (A.R. 59.)  As an example, Plaintiff noted that he used to buy gallons of milk, but now the family buys half gallons because it is easier for Plaintiff to pull those out of the refrigerator.  (A.R. 59.)

To help manage the pain, Plaintiff takes four standing showers a day because the hot water helps relieve pain in the inflamed area.  (A.R. 56-57.)  Regarding his current medication regimen, Plaintiff testified that he is taking meloxicam, gabapentin, naproxen, and sertraline, as well as over-the-counter medications like Aleve, Advil, and Tylenol.  (A.R. 50-51.)  He also uses sports creams, including Joseph's cream, focalin cream, CBD cream, and Biofreeze.  (A.R. 51.)

At the end of the hearing, the ALJ stated he would keep the record open for additional evidence until June 12, 2020.  (A.R. 47, 70.)

### ii.  Vocational Expert's Testimony

The Vocational Expert, Yaakov Taitz ("VE"), began by classifying Plaintiff's past work as a production supervisor in a glass factory, which has a DOT Code of 677.131-010, a specific vocational preparation ("SVP") of 7, and, although normally categorized as a light exertional occupation, here, it was performed at a medium exertional level.  (A.R. 67.)

The ALJ then proceeded to ask the VE the following hypothetical:

[A]ssume an individual of claimant's age, education, and work experience . . . would be limited to light work exertion as defined by the regulations with the following additional limitations[:] The individual could frequently climb ramps and stairs; could never climb ladders, ropes, or scaffolds.  The individual could frequently balance; occasionally stoop, kneel, crouch, and crawl; and could frequently handle.  With those limitations, could such an individual perform the claimant's past work as you classified it?

(*Id*.)  The VE replied, "Yes, your Honor, they can do the job, based on the DOT."  (*Id*.)  The ALJ then asked if the hypothetical individual were limited to sedentary work exertion, as defined by the regulations, could that individual perform his past work?  (A.R. 67-68.)  The VE responded that the hypothetical person would not be able to perform his past work.  (A.R. 68.)  The ALJ then followed up and asked whether there would be transferable skills from his past work to this

hypothetical, to which the VE replied that there were no reconcilable good matches for sedentary jobs.  (*Id*.)

> For the third hypothetical, adding to the first hypothetical, the ALJ asked:

> [I]f . . . the individual could occasionally climb ramps and stairs; could never crouch, never crawl; occasionally balance; and, additionally, the individual, in addition to frequent handling, could frequently finger and frequently feel.  With those, that combination of limitations, could such an individual perform the claimant's past work as you classified it?  Per the DOT.

(*Id*.)  The VE replied, "Yes, based on the way generally performed in the DOT, he can do the job."  (*Id*.)  The ALJ followed up and asked, "If the individual were, just for the record, limited to simple, routine tasks [and] instructions, I take it that would preclude [the] past work as generally performed, correct?"  (A.R. 69.)  The VE replied, "Yes."  (*Id*.)  The ALJ then further asked, "If the individual could occasionally handle, finger, and feel, that would also [preclude] the past work?"  (*Id*.)  The VE replied, "Yes, it would preclude [the] job."  (*Id*.)

Finally, the ALJ asked if the individual were "off-task 15 percent or more of the workday or absent two or more times per month on average, would there be any work for such an individual?"  (*Id*.)  The VE replied that there would be "no work."  (*Id*.)

## C.  ALJ Decision

On July 1, 2020, the ALJ issued a written decision analyzing whether Plaintiff satisfied his burden to demonstrate disability using the standard five-step process.  (A.R. 29-36.)  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability.  (A.R. 31.)  At step two, the ALJ found that Plaintiff had the following severe impairments: lumbar degenerative disc disease; cervical degenerative disc disease; thoracic spondylosis; chronic pain syndrome; bilateral carpal tunnel syndrome; and osteoarthritis of the knees bilaterally.  (A.R. 32.)  At step three, the ALJ determined that Plaintiff "does not have an

impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in the relevant CFR.  (*Id*.)  In so deciding, the ALJ considered listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), and 11.14 (peripheral neuropathy). (*Id*.)

The ALJ then determined that Plaintiff had the residual functional capacity ("RFC") to perform light work, with the exceptions that Plaintiff could frequently handle, finger, and feel, occasionally climb ramps and stairs, occasionally balance, stoop, and kneel, but never climb ladders, ropes, or scaffolds, and never crouch or crawl.  (A.R. 33.)  At step four, the ALJ found that Plaintiff was capable of performing past relevant work as a production supervisor as defined by the DOT as that work does not require the performance of work-related activities precluded by Plaintiff's RFC.  (A.R. 35.)  As such, the ALJ determined that Plaintiff was not disabled.  (A.R. 36.)

## II.  <u>STANDARD OF REVIEW</u>

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001).  The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential.  *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Indeed,

"substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (internal quotations and citations omitted). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." *Id*. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id*. § 1382c(a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id*.

§ 404.1520(a)(4)(i); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).  If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits.  *See id*. § 404.1520(b); *see also Bowen*, 482 U.S. at 140.  Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities.  *Id*. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5.  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs."  *Id*. § 404.1522(b).  These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling."  *Id*. § 404.1522(b)(1).  A claimant who does not have a severe impairment is not considered disabled.  *Id*. at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List").  *Id*. § 404.1520(a)(4)(iii).  If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits.  *See id*. § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5.  If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent.  *See id*. § 404.1526(a).  If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment.  *Id*.  An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar.  *Williams*, 970 F.2d at 1186.  If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must

prove at step four whether he or she retains the RFC to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141.

If the claimant can perform past relevant work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her past relevant work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's RFC, age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant can perform work and not disabled. *Id*.

III.   **PLAINTIFF'S CLAIMS ON APPEAL**

Plaintiff argues, first, that the Appeals Council, when denying review of the ALJ's decision, failed to properly consider the new functional report from Plaintiff's treating physician, Dr. Paris, and therefore, this Court should remand to the ALJ for two reasons: (1) the Appeals Council failed to properly articulate a reason for denying review of Dr. Paris's report; and (2) regardless, the report is new and material, and there was good cause for not submitting this evidence while the record was open before the ALJ. Additionally, Plaintiff argues that the ALJ's decision was not based on substantial evidence, because the ALJ failed to articulate explicit reasons for discounting Plaintiff's testimony.

**A. Plaintiff Does Not Have Good Cause to Submit Dr. Paris's Report**

As an initial matter, the Court does not have statutory authority to review the Appeals Council's decision to deny review of Dr. Paris's report.  The Third Circuit has plainly stated that "[n]o statutory authority (the source of the district court's review) authorizes [district courts] to review the Appeals Council decision to deny review." *Matthews*, 239 F.3d at 594.  This is because once "the Appeals Council denies the request for review, the ALJ's decision is the Commissioner's final decision." *Id*. at 592; *see Eads v. Secretary of Dept. of Health and Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993) (explaining that district courts can review new evidence when the Appeals Council "has accepted the case for review and made a decision on the merits, . . . [but] [i]t is wrong when the Council has refused to review the case. For then the decision reviewed in the courts is the decision of the administrative law judge." (internal citations omitted)).  And the judicial review provision of the Social Security Act only allows claimants to seek review in a district court upon "any final decision of the Commissioner of Social Security[.]" 42 U.S.C. § 405(g); *Matthews*, 239 F.3d at 592 ("A claimant who was unsuccessful in the administrative process may seek judicial review once there is a final decision by the Commissioner of Social Security.")  Therefore, this Court does not have the authority to review the Appeals Council's decision to deny review of Dr. Paris's report.

In addition to my lack of statutory authority to review the Appeals Council decision, "[n]o statutory provision authorizes the district court to make a decision on the substantial evidence standard based on the new and material evidence never presented to the ALJ." *Id*. at 594.  In other words, "new evidence may not be considered by this Court." *Andrade v. Comm'r of Soc. Sec.*, No. 18-14970, 2019 WL 4894540, at *2 (D.N.J. Oct. 4, 2019).  Instead, when faced with new evidence not considered by the ALJ, so long as the claimant satisfies a three-prong test articulated

in 42 U.S.C. § 405(g), district courts are authorized "to remand this case to the [ALJ] for consideration of [that] new evidence." *Andrade*, 2019 WL 4894540, at *2; *see Hamm v. Astrue*, No. 08-5010, 2009 WL 2222799, at *6 (D.N.J. July 22, 2009) ("[A] district court may order a 'new evidence' remand . . . if the claimant satisfies a three-prong test."); *see also Matthews*, 239 F.3d at 592 ("If the claimant proffers evidence in the district court that was not previously presented to the ALJ, then the district court may remand to the Commissioner but that disposition is governed by Sentence Six of § 405(g)."). The test requires the evidence to be (1) new and (2) material, and (3) there must be "good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *see Hamm*, 2009 WL 2222799, at *6.

Evidence is considered "new" if it was not in the record before the ALJ and is "not merely cumulative of what is already in the record." *Hamm*, 2009 WL 2222799, at *6 (quoting *Szubak v. Secretary of HHS*, 745 F.2d 831, 833 (3d Cir. 1984)). Evidence is "material" when it "relate[s] to the time period for which benefits were denied," *Szubak*, 745 F.2d at 833, and "there is a reasonable possibility that its introduction would have changed the ALJ's decision." *Pagan v. Comm'r of Soc. Sec.*, No. 17-769, 2018 WL 485667, at *5 (D.N.J. Jan. 18, 2018). Finally, "a finding of 'good cause' requires 'some justification for the failure to acquire and present such evidence to the Secretary.'" *Id*. at *6 (quoting *Szubak*, 745 F.2d at 834). Courts have noted that good cause is necessary to ensure that claimants are "afforded only one fair opportunity to demonstrate eligibility for benefits under any one set of circumstances." *Szubak*, 745 F.2d at 834. Otherwise, claimants "might be tempted to withhold medical reports, or refrain from introducing all relevant evidence, with the idea of obtaining another bite at the apple," turning "the procedure into an informal, end-run method of appealing an adverse ruling by the Secretary." *Id*. (internal quotations and citation omitted); *Matthews*, 239 F.3d at 595 (3d Cir. 2001) ("If we were to order remand for each item of

16

new and material evidence, we would open the door for claimants to withhold evidence from the ALJ in order to preserve a reason for remand").

Here, Plaintiff argues that the introduction of Dr. Paris's report meets the three-prong test. Specifically, Plaintiff contends that because the report did not exist at the time of the ALJ's decision, and the functional limitations described in the report are more favorable than those in the ALJ's RFC, the report is new and material. Further, Plaintiff maintains that there is good cause for having not submitted the report earlier, reasoning that he retained new counsel following the ALJ's decision, and the new counsel promptly assisted Plaintiff in obtaining Dr. Paris's report prior to the proceeding.

I find that there is a lack of good cause for obtaining and submitting this evidence *after* the ALJ issued his decision. First, Plaintiff has not articulated any valid "justification for the failure to acquire and present [Dr. Paris's report] to the Secretary." *Pagan,* 2018 WL 485667, at *6. And as Plaintiff notes in his brief, it is his burden to do so. Pl. Br. at 18 (citing *Szubak*, 745 F.2d at 833). Although courts have not formulated a particular set of guideposts for what constitutes a valid justification, the Appeals Council's regulations for deciding whether to grant review of new material, while not binding, are instructive. These regulations state that good cause for submitting new evidence may be shown because: "(1) Our action misled you; (2) You had a physical, mental, educational, or linguistic limitation(s) that prevented you from informing us about or submitting the evidence earlier; or (3) Some other unusual, unexpected or unavoidable circumstance beyond your control prevented you from informing us about or submitting the evidence earlier." 20 C.F.R. § 404.970(a)(5). Plaintiff's good cause argument does not fall within any of the valid reasons set forth by the regulation, nor does Plaintiff provide any other legitimate justification. Plaintiff's only explanation for failing to obtain this evidence is a vague statement, without any further

explanation, that Plaintiff's previous counsel "failed to adequately assist him in developing the record[.]" Pl. Reply Br. at 3. This is wholly insufficient. Plaintiff was represented by counsel throughout the disability application process. According to the record, Dr. Paris has been Plaintiff's primary care doctor since at least 2016. (A.R. 20.) Dr. Paris's treatment notes, which are summarized by parts of the report, can be found throughout the administrative record.[1] Plaintiff provides no reason why such a report could not have been created at any time between when Plaintiff filed his application for disability on April 14, 2019, and when the ALJ closed the record on June 12, 2020. (A.R. 47, 70.) Plaintiff neither argues he faced unusual or unexpected circumstances beyond his control, nor does he explain how, exactly, the mere failure to obtain this report means that Plaintiff's prior counsel did not adequately assist Plaintiff in developing the record. Ultimately, Plaintiff's good cause argument appears to boil down to either that current counsel disagrees with prior counsel's legal strategy to not obtain Dr. Paris's report, or that prior counsel was somehow negligent. Neither reason is adequate justification for submitting new evidence, and, in turn, is not good cause.

Moreover, accepting Plaintiff's argument would be against sound public policy. As the Third Circuit has advised, claimants should be "afforded only one fair opportunity to demonstrate eligibility for benefits under any one set of circumstances." *Szubak*, 745 F.2d at 834. This is to ensure that litigants do not withhold or delay obtaining and presenting evidence until after an unfavorable decision by the ALJ, thereby gaming the appeals process to receive a remand and a new hearing.

---

[1] The parties do not dispute that while the report was completed and signed by Nurse Robbie, it was done so on behalf of Dr. Paris. (A.R. 25.)

Nevertheless, Plaintiff argues that because he did not conceal or hide Dr. Paris's report, and therefore act in bad faith, this policy does not apply to the present matter.[2]  I disagree.  A lack of bad faith does not equate to good cause.  The policy's underlying purposes apply even without bad faith.  *See, e.g.*, *Hamm*, 2009 WL 2222799, at *6 (finding good cause because ALJ failed in his heightened duty to develop the record by closing the record to previously unrepresented Plaintiff with new attorney who needed time to submit additional evidence); *Pagan*, 2018 WL 485667, at *6 (finding good cause because the ALJ changed the time of a supplemental hearing where Plaintiff planned to submit new evidence without adequate notice).  Here, there were no circumstances preventing Plaintiff from requesting the creation of this report prior to the close of evidence.  Nor was Dr. Paris's report created prior to the close of evidence, but for whatever reason, was unobtainable until after the ALJ published his opinion.  *See Hamm*, 2009 WL 2222799, at *6 (remanding for consideration of new, material medical evidence from treating physician that had been created prior to the ALJ hearing).  Rather, Plaintiff's counsel went to Dr. Paris, Plaintiff's primary care doctor who had been treating Plaintiff since 2016, and asked for a new report to be created, based largely on information and impressions from prior visits to Dr. Paris already in the

---

[2] In support, Plaintiff cites to *Hamm*, where the court found there was good cause to remand to consider new evidence.  *Hamm*, 2009 WL 2222799, at *6.  In *Hamm*, the claimant was unrepresented until 15 days prior to the ALJ hearing.  *Id*. at *1.  At the end of the hearing, the ALJ closed the record, despite Hamm's attorney's request to keep the record open to add new evidence.  *Id*. at *1, *6  On appeal, the district court ruled that the ALJ failed to fulfill his duty to fully develop the record because, although Hamm was represented by counsel at the hearing, he had been unrepresented until 15 days prior to it, and therefore, the ALJ had a heightened duty to develop the record and thus should have kept the record open to allow Plaintiff's new counsel to obtain and submit relevant medical evidence.  *Id*. at *6-*8.  The court also noted that Hamm's counsel acted diligently, requesting the new medical evidence immediately following the hearing, and therefore, it did not appear Hamm's counsel had sought to conceal any evidence.  *Id*. at *8.  Here, *Hamm* does not apply.  The *Hamm* court found good cause largely because Plaintiff had been unrepresented for nearly the entire disability process, thereby triggering the heightened duty to develop the record, not because Hamm's new counsel acted in good faith.  There is no such issue here.  Plaintiff has been represented by counsel since he filed for disability.

administrative record.  It would be contrary to public policy that any time a claimant, represented by counsel at the hearing, retains new counsel following an adverse decision from an ALJ, and that new counsel obtains a medical source report from a longtime treating physician, that Plaintiff would receive a new hearing.  Remanding under such circumstances, even if no bad faith exists, would stand in contrast to the Third Circuit's advisement that claimants should only be afforded one fair opportunity to demonstrate eligibility.  As such, there is no good cause to remand this matter for review of the newly submitted evidence.

Furthermore, while Dr. Paris's report may arguably be new, it is not material, as it would not change the outcome of the ALJ's decision.  *See Pagan*, 2018 WL 485667, at *5.  While the report may identify functional limitations that differ from the state agency physicians' reports and the ALJ's RFC determination, the report is based on Dr. Paris's experiences treating Plaintiff, which are recorded in treating notes already in the record.  Thus, even if Dr. Paris's report were to be admitted belatedly into the record, it would be unlikely to change the ALJ's decision because the ALJ has already considered the evidence on which this report is based, and incorporated those findings into Plaintiff's RFC.  Because Dr. Paris's report is not material, and there is not good cause, I deny Plaintiff's request to remand for consideration of the report.

**B.  The ALJ's Opinion is Based on Substantial Evidence**

Next, Plaintiff argues that the ALJ failed to properly articulate a reason for finding Plaintiff's subjective statements regarding his pain to be inconsistent with the medical record.  Pl. Br. at 22-23.  Rather, Plaintiff asserts that the ALJ merely summarized the available evidence and gave no specific reasons for finding his testimony to be inconsistent.  *Id*.  I disagree, and conclude that the ALJ appropriately discounted Plaintiff's subjective testimony.

The ALJ must consider and weigh all non-medical evidence before him, including claimant's allegations of pain. See *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 122 (3d Cir. 2000). However, the alleged pain and other subjective symptoms "must be supported by objective medical evidence." *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529). When considering a claimant's allegations, alongside the objective medical evidence, an ALJ has the authority to make credibility determinations of a plaintiff's testimony, specifically with regard to pain and other subjective complaints. *Malloy v. Comm'r of Soc. Sec.*, 306 Fed. Appx. 761, 765 (3d Cir. 2009) (citing *VanHorn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)). Credibility determinations turn on whether there are inconsistencies in the evidence, and whether there are conflicts between the claimant's statements and the objective evidence. 20 C.F.R. 404.1529(c)(4). In that regard, the ALJ must establish the basis for concluding that a plaintiff's testimony is not credible. See *Cotter v. Harris*, 642 F.2d 700 (3d Cir. 1981).

Here, the ALJ found that Plaintiff's subjective statements of pain were inconsistent with the evidence in the record, and then set forth the evidence he found to be inconsistent with those complaints. (A.R. 34-35.) For example, the ALJ examined the medical record and noted that on March 8, 2019, Plaintiff had no swelling or stiffness in his joints, normal motor strength, normal flexion and extension in his cervical spine, no tenderness or spasms in his lumbar spine, and normal lordosis. (A.R. 34.) This example is consistent with Plaintiff's other medical records, which regularly reported that Plaintiff had full strength and movement in his extremities, intact sensation, normal muscle tone and strength, normal gait, and normal neurological abilities. (A.R. 296, 302, 308, 311, 314, 317, 372, 386, 397, 451, 455-56.) The ALJ also stated that the impression of Plaintiff's thoracic spine MRI on May 17, 2019, was that Plaintiff had no significant spinal canal or neural foraminal stenosis. (A.R. 34.) While Plaintiff's cervical spine MRI showed degenerative

21

changes at C5-6 and C6-7, this demonstrated only moderate spinal canal and mild to moderate neural foraminal stenosis.  (*Id.*)  On July 9, 2019, Plaintiff reported that he was feeling better.  (*Id.*)  Furthermore, the ALJ noted that the state agency medical consultants opined that Plaintiff could stand or walk for 6 hours in a workday and could sit for 6 hours of a workday, as well as occasionally lift 20 pounds and frequently carry 10 pounds.  (A.R. 35.)  Citations within the ALJ opinion also make clear that the ALJ considered the entire record in making his finding that Plaintiff's subjective symptoms were inconsistent with the record.  (A.R. 32-36.)

For these reasons, the ALJ appropriately articulated his basis for finding that Plaintiff's subjective symptoms were inconsistent with the medical evidence.  As such, the ALJ's opinion in this regard was based on substantial evidence.

## IV.   **CONCLUSION**

For the reasons set forth above, the ALJ's decision is **AFFIRMED**.  An appropriate order shall follow.


Date:   April 18, 2022                                  /s/ Freda L. Wolfson
                                                        Freda L. Wolfson
                                                        U.S. Chief District Judge